**In the Matter of Linda Sue LOVE, Debtor.**

**Linda Sue LOVE, Plaintiff,**

v.

**DEPARTMENT OF HEALTH, EDUCATION AND WELFARE Office of Education the Riddell National Bank, Defendants.**

**Bankruptcy No. 81–02144–TH.**
**Adv. Nos. 82–0159, 82–0160.**

United States Bankruptcy Court, S.D. Indiana.

March 7, 1983.

G. Steven Fleschner, Terre Haute, Ind., for plaintiff/debtor.

Harold R. Bickham, Asst. U.S. Atty., Indianapolis, Ind., for United States.

David D. Haynes, Terre Haute, Ind., for Riddell National Bank.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

MICHAEL H. KEARNS, Bankruptcy Judge.

These matters came on for trial on the 10th day of December, 1982, upon the plaintiff/debtor's Complaints to Determine Dischargeability of a student loan. The United States of America failed to appear and relied upon counsel for Riddell National Bank. The following Findings of Fact, Conclusions of Law and Order are hereby adopted with respect to the said Complaints, after hearing the evidence and arguments thereon and being duly advised in the premises.

### FINDINGS OF FACT

1. The plaintiff/debtor herein, Linda C. Love, is a twenty-eight (28) year old female who graduated from a Brazil High School in Brazil, Indiana, in 1972.

2. Plaintiff enrolled in Indiana State University in Terre Haute, Indiana (I.S.U.), in 1972, and became a major in physical education.

3. Plaintiff graduated from Indiana State University in Terre Haute, Indiana, in 1977, with a B.S. in physical education.

4. The plaintiff's cumulative GPA at I.S.U. was 2.3 on a 4 point scale.

5. Plaintiff did student teaching, but has no license to teach in the State of Indiana. Plaintiff testified that she never procured one because she never got a job teaching in the State of Indiana.

6. The loans which are the subject of this litigation were made by the defendants to the plaintiff on October 20, 1972; August 27, 1973; August 19, 1974; August 19, 1975; and August 20, 1976.

7. These loans were all combined in a promissory note on which is due and owing at the time of trial the sum of Four Thousand Four Hundred Seventy-seven Dollars and Fifty Cents ($4,477.50).

8. The plaintiff has never taught school. She applied to all schools in a multi-county area in West-Central Indiana, and in addition, many school corporations in Illinois, when she completed school, but never received a job offer or a job in teaching.

9. The plaintiff worked while a student at I.S.U. as a clerk and continued to work there after graduation as a clerk-typist in the I.S.U. security department. This job was for minimum wage and continued for one (1) year after graduation, because defendant was unable to find better employment.

10. The plaintiff next worked at Fleetwood Mobile Homes, where she was an electrician. Her college experience was not a prerequisite for her employment on this job. She did wiring during the mobile home construction process, and lost that job when the plant closed.

11. The next job of substance that the plaintiff had was that of a material handler at a steel plant. She was employed there for one (1) year, and the plant then closed, and she lost her job. While plaintiff had this job, she bought a home which she later lost because of her inability to make the mortgage payments. The mortgagee is listed as a creditor in her Bankruptcy Schedules.

12. The next job plaintiff had following the employment at the steel plant, was as a manager-trainee at Wendy's, a fast-food franchise, having thereafter becoming an assistant manager at Wendy's, a job which paid minimal wages.

13. In an attempt to improve her employment situation, the plaintiff then left Wendy's and went to Chicago where she secured employment as a security guard at a hospital in the Chicago area. This job paid minimal wages. The plaintiff then left that job and came back to the Terre Haute-Brazil area, where she was unable to obtain new employment for a few months.

14. Plaintiff then worked at another hamburger franchise, from where she was discharged because of a disagreement with a superior.

15. Plaintiff now works at MacDonald's in Terre Haute, Indiana, and was employed there at the time of trial for three and one-half (3½) months, making minimum wage of Three Dollars and Thirty-five Cents ($3.35) per hour, and working between 20–30 hours per week, said hours being all that were made available, although she was desirous of fuller employment.

16. The plaintiff is not married and has no children. The plaintiff's monthly budget of expenses is approximately, as follows:

1. Payments on a Plymouth Volare, 1978 —$95.42

2. Insurance—$10.00

3. Rent—$280.00 (split with roommate—her share $140.00)

4. Utilities—$94.00 (split with roommate—her share $47.00)

5. Telephone—$24.00 (split with roommate—her share $12.00)

6. Gasoline—$10.00 per week

7. Food—$30.00 per week

8. Clothes—$10.00 per month

Plaintiff testified that she spends no money on recreation.

17. Plaintiff's tax returns show the following income for the following years:

| 1977 | — | $ 5,141.17 |
|------|---|-----------|
| 1978 | — | $ 7,937.08 |
| 1979 | — | $ 13,188.52 |
| 1980 | — | $ 8,403.87 |
| 1981 | — | $ 6,694.74 |

The plaintiff further testified that her income for 1982 will show a decrease from her 1981 taxable income.

18. According to a record of payment, plaintiff paid on this obligation the sum of One Thousand Four Hundred Ninety-two Dollars and Fifty Cents ($1,492.50) between 1978 and 1980.

19. Said payment constituted twenty-five percent (25%) of the gross indebtedness when she graduated from I.S.U.

20. The payment record of Linda Sue Love on the student indebtedness is, as follows:

| 5/24/78 | — | $ 49.75 |
|---------|---|---------|
| 6/12/78 | — | $ 49.75 |
| 7/22/78 | — | $ 49.75 |
| 8/8/78 | — | $ 49.75 |
| 9/6/78 | — | $ 49.75 |
| 10/30/78 | — | $ 49.75 |
| 11/20/78 | — | $ 49.75 |
| 12/16/78 | — | $ 49.75 |
| 2/6/78 (sic) | — | $ 49.75 |
| 2/19/79 | — | $ 49.75 |
| 3/10/79 | — | $ 49.75 |
| 5/15/79 | — | $ 49.75 |
| 6/5/79 | — | $ 49.75 |
| 6/12/79 | — | $ 49.75 |
| 7/7/79 | — | $ 49.75 |
| 8/20/79 | — | $ 49.75 |
| 9/10/79 | — | $ 49.75 |
| 10/8/79 | — | $ 49.75 |
| 11/9/79 | — | $ 49.75 |
| 12/8/79 | — | $ 49.75 |
| 1/8/80 | — | $ 49.75 |
| 2/9/80 | — | $ 49.75 |
| 3/11/80 | — | $ 49.75 |
| 4/7/80 | — | $ 49.75 |
| 5/7/80 | — | $ 49.75 |
| 7/8/80 | — | $ 49.75 |
| 9/5/80 | — | $149.25 |
| 10/28/80 | — | $ 49.75 |

21. Debtor's schedules herein list a total indebtedness of Nine Thousand Four Hundred Twenty-eight Dollars and Eighty-eight Cents ($9,428.88), plus whatever deficiency balance might be due and owing to First Federal Savings and Loan Association of Brazil, Indiana, on a house that was voluntarily deeded back to said secured party.

## DISCUSSION

11 U.S.C. § 523(a)(8) provides as follows:

"A discharge under Section 727, 1141 or 1328(b) of this Title does not discharge an individual debtor from any debt for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution of higher education, unless........(b) Excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;".

Many courts have struggled with attempting to formulate standards by which to judge adequately, and with an acceptable level of consistency, what constitutes "undue hardship". The most exhaustive and complex analysis of this situation was offered by the Court of the Eastern District of Pennsylvania, *In re Johnson* 5 B.C.D. 532, in which a tri-level test was adopted. The first part of it was strictly a mechanical test, comparing financial resources and expenses in light of the debtor's skills, educational level, employment record, and ability to retain employment. The second level, assuming the debtor could pass the mechanical test, was a good faith test which looks at whether the debtor has made an attempt to maximize income and minimize expenses, and whether the debtor's insolvency was due to factors within or beyond the debtor's control. Finally, the *Johnson* Court had a policy test which looked at two factors, one, whether the dominant purpose of the Bankruptcy was to escape liability for the student loan, and, two, whether the education obtained through the loan had enhanced the debtor's learning capacity. If the debtor failed on any of these three levels to prevail, the debt was deemed to be nondischargeable.

This Court is of the opinion that this exhaustive test, though very useful, is perhaps not exhaustive enough and needs to be amended before it is adopted for use in this case. With regard to level one of the policy test, whether the dominant purpose of the Bankruptcy was to escape liability for the student loan, at least two other factors should be considered, being, one, the length of time which has elapsed between the graduation or departure of the debtor from the program of instruction and the filing of the Bankruptcy, and, two, the amount of money paid by the debtor on the obligation prior to the Bankruptcy having been filed. The legislative history of this particular exception indicates that there was very strong negative Congressional reaction to this particular scenario: Debtor graduates from college with large number of student loans; before debtor embarks on his journey through his working life, he runs all of his student loans, which constitute virtually his only debts, through Bankruptcy Court, not having paid anything on them at all. It is the Court's opinion that the further one gets away from that scenario, the weaker the policy interest in making this type of debt nondischargeable becomes. Including within the analysis the two above-mentioned considerations would seem to alleviate that problem. This Court also regards a "slip once and you lose" approach to this analysis as mechanical and unfair, and intends to balance the findings on each prong of the analysis depending upon the relative strength of each given these facts.

Looking at the facts of this case, pursuant to the *Johnson* triple-level test, as amended by this Court, this Court finds that the first level of the test requires examining the following:

1. Past and current financial resources.
2. Future resources and prospects in light of the debtor's skills, educational level, employment record, and ability to retain employment.
3. Debtor's expenses, and whether they were reasonably prudent.

With respect to her past and current financial resources, the debtor only was able to make a decent living when she was doing factory work. In two instances, her factory jobs disappeared due to plant closings, requiring that she be laid off. Her current financial resources are that of part-time employee at a fast-foods restaurant, making minimum wage.

With respect to her future resources, one looks at her degree from Indiana State University and might assume that her prospects would be bright. However, experience has not shown this to be the case up to now, and there is no reason to believe that this situation, given the current economic climate, is going to get any better. Her most recent employment record includes factory work which she is no longer able to obtain because of the paucity of its availability in the Terre Haute area, debtor's place of residence, and working at fast-food restaurants.

With respect to her expenses, the budget testified to in Court reveals an involuntarily ascetic existence, made possible only by the fact of an expense-sharing arrangement with her roommate. The only expense that could possibly not be called "minimal and nondiscretionary" would be the automobile payment, which, in the view of this Court, would be a brutal finding, in light of the evidence of debtor's need for automotive transportation in getting to and from work. The Court is therefore satisfied that the debtor has passed the requirements of the first level of the *Johnson* test, that being that it is going to be very difficult for her to continue to make payments on this loan.

■ With regard to the good faith test, the rationale for considering this was that the overall policy of the Code was to give a fresh start, a financial tabula rasa, to an honest, unfortunate debtor. *Local Loan Company vs. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). *In re Brown,* 18 B.R. 219 (Bkrtcy.1982), Dist. of Kan. *Johnson,* when considering the matter of good faith, looked at the following:

1. Whether the debtor had made an attempt to maximize income and minimize expenses.

2. Whether the debtor's insolvency was due to factors within or beyond the debtor's control.

■ In this case, it has not been shown that the debtor was anything other than frugal in her spending habits, and her current budget has done nothing to create the impression of a spend-thrift. Moreover, with regard to whether or not her insolvency was due to factors beyond debtor's control, one must look at the economic malaise that has overcome the entire Country, and realize that Terre Haute has not escaped its grip. Focusing on this debtor's personal situation, the evidence demonstrates an exacerbated example of the unavailability of gainful employment. In the instant case is a young woman who was trained to be a teacher, was unable to work in that profession, then took two factory jobs in a good faith and reasonable attempt to support herself, and lost them both because of plant closings. There are no facts in this record which would indicate that this debtor is anything but in good faith with respect to level two of the *Johnson* Court test.

3. Finally, we look to the policy test which the *Johnson* Court set forth, as we have amended it to some degree. We first look at whether the dominant purpose of the Bankruptcy was to escape liability for the student loan. Having taken judicial notice of the schedules filed in the Bankruptcy Petition, it is clear that approximately 47.5% of the total indebtedness of the debtor is on this obligation, unless a deficiency balance exists on the debtor's home loan. On these facts, if nothing else was considered, it might be possible to draw the conclusion that the dominant purpose of this Bankruptcy was to escape liability for the student loan, and that the criteria set forth in *Johnson* requires that this not be allowed. However, as discussed earlier, the public policy is not all that clear. In this case, we have a young woman who attempted to pay, and in fact did pay for a long period of time on this obligation, a total of twenty-five percent (25%) of the obligation. Secondly, we have a rather long period of time, well over four (4) years, between the end of the debtor's education, and the time which she filed Bankruptcy. If time were not considered by Congress to be a factor, certainly 11 U.S.C. § 523(a)(8)(A) would not have been written into the Code. This provision states roughly that after five (5) years there is no problem with dischargeability. The debtor herein missed being covered by this provision by a matter of a few months. Is the Court to assume that the policy reasons for nondischargeability of this particular type of debt remain constant for five (5) years and then disappear altogether at the five (5) year point? It strains credulity to believe that that is so, and therefore the Court believes it is entirely justifiable to consider the time factor. When one puts the time factor in this case together with the payment record, one finds that whether or not the dominant purpose of the Bankruptcy was to discharge the remainder of the liability on the student

loan, the policy reasons which originally gave rise to the provisions of 523(a)(8) are not nearly as strong and cannot overcome the findings on the first two levels of the analysis.

The second part of the policy test, whether the education obtained through the loan had enhanced the debtor's earning capacity, has clearly been met—there is no evidence in the record whatsoever, in fact a great deal of contrary evidence, to show that the debtor's earning capacity had been increased at all by her educational experience.

Based on the foregoing analysis, the debtor should be entitled to discharge these loans.

## CONCLUSIONS OF LAW

1. Excepting from discharge the debts owed by this debtor to Riddell National Bank and insured by the United States of America will impose an undue hardship on the debtor.

2. The debtor does not have sufficient means and income to pay the debt to the defendants herein.

3. The debtor filed her Petition in Bankruptcy in good faith, and her insolvency was due chiefly to factors beyond the debtor's control.

4. The public policies which gave rise to 11 U.S.C. 523(a)(8) do not require that this particular debt be determined to be nondischargeable.

## ORDER

IT IS, THEREFORE, ORDERED by the Court that plaintiff have judgment against the defendants, and each of them, that the debt she owes to Riddell National Bank which is insured by the Department of HEW Office of Education, is dischargeable, and that said indebtedness be discharged, after notice and the appropriate hearing in the main cause.