In the Matter of Donald Lee
**COLEMAN, Carol Sue
Coleman, Debtors.**

**Donald Lee COLEMAN, Plaintiff,**

v.

**HIGHER EDUCATION ASSISTANCE
FOUNDATION, Defendant.**

**Bankruptcy No. 88–198 TH.
Adv. No. 88–65.**

United States Bankruptcy Court,
S.D. Indiana,
Terre Haute Division.

March 27, 1989.

## MEMORANDUM OF DECISION

HARRY C. DEES, Jr., Bankruptcy Judge.

This matter is before the court on the Plaintiff/Debtor, Donald Lee Coleman's, COMPLAINT TO DETERMINE DISCHARGEABILITY OF A STUDENT LOAN ("Complaint"). The Plaintiff requests a finding by the court that excepting the student loan from discharge financed by the Defendant, Higher Education Assistance Foundation, would impose an "undue hardship" on the Plaintiff and therefore the debt for the student loan should be found dischargeable. A trial on the matter was held and briefs were submitted by the parties. For the reasons set out below, the court finds the debt NON-DISCHARGEABLE.

### Jurisdiction

This matter concerns the Plaintiff's dischargeability complaint under 11 U.S.C. § 523(a)(8)(B) and Bankruptcy Rule 7001(6) and as such is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). Pursuant to 28 U.S.C. § 157(a) and the October 7, 1988 "Designation of a Bankruptcy Judge for Service in Another District within the Circuit," issued by the Judicial Counsel of the Seventh Circuit, assigning the undersigned to hear certain cases in the Terre Haute Division of the Bankruptcy Court for the Southern District of Indiana, this case was referred to the undersigned bankruptcy judge for hearing and determination.

The court has reviewed the record including briefs, testimony, evidence, and arguments of counsel and makes the following entry. This entry shall serve as findings of fact and conclusions of law as required by Bankruptcy Rules 7052 and 9014.

### Findings of Fact

1. The Plaintiff, Donald Lee Coleman, is 42 years old and a high school graduate. He has been married for 25 years and is the father of five children.

2. The Plaintiff's children include: Donald Jr., age 24, who lives at home and who has a slight case of cerebral palsy on the right side of his body which affects his hand, leg, and foot, and he does not receive disability income but makes approximately $35.00 per week from a paper route; a 19 year old son and an 18 year old daughter, both at home, who are seniors in high school; and a 12 year old daughter, at home, and still in grade school. The Plaintiff also has an adult daughter who is no longer living at home.

3. The Plaintiff completed training in April of 1987 at the Tri–State Driving School, Middletown, Ohio, with a degree as a semi-driver.

4. The Plaintiff used this degree to get a job with North American Van Lines in Fort Wayne, Indiana, in June of 1987.

5. The Plaintiff worked for North American for five weeks before quitting his job because he was "scared," "on the road constantly," and was experiencing problems with his family at home.

6. The loans which are the subject of this litigation, include two notes for tuition executed by the Plaintiff on March 31, 1987. The first note was in the amount of $2,625.00 at 8% interest with repayment over 64 months at $50.00 per month and a final payment of $45.74. The amount of the second note was $1,775.00 at 12% interest with repayment over 44 months at $51.18 per month.

7. The Plaintiff admitted that he owed $4,569.94 on the student loans.

8. The Defendant holds a claim assigned to it for the student loans made to the Plaintiff under the Guaranteed Student Loan Program ("GSLP") established by the Higher Education Act of 1965, Pub.L. No. 89–329, Nov. 8, 1965, Title IV, 79 Stat. 1219 (20 U.S.C. §§ 1071 to 1087–4). The Defendant qualifies as a guaranty agency under the GSLP and the loans are reinsured by the United States Department of Education.

9. The Plaintiff has not made any payments on the notes.

10. The Plaintiff at time of trial was employed part-time by Terre Haute Coke and Chemical at $7.50 per hour. His net was approximately $250.00 per week. He contends that the plant's future may be unstable as the result of compliance problems with the Environmental Protection Agency ("EPA").

11. The Plaintiff's wife is employed part-time as a cook at Rax Restaurant at $3.75 per hour. She nets about $87.00 per week.

12. In 1964, the Plaintiff was employed by Stran Steel Corporation in Terre Haute, Indiana, in various positions such as: welder, weld inspector, crane operator, painter, foreman, fabricator, lift truck operator, shearman, brake operator, punch operator, roll machine operator and lay-out accessory gatherer. He earned $10.50 per hour. The plant ceased operation and the Plaintiff lost his job.

13. In 1981, the Plaintiff was employed as a welder fitter at J.I. Case Company in Terre Haute, Indiana, and earned $10.57 per hour. The plant closed and he was again out of work.

14. In 1985, the Plaintiff was employed by Chesty Foods in Terre Haute, Indiana. The positions he held included maintenance man and maintenance foreman. He earned $8.56 per hour. He quit this job after six months because the company expected him to work too many hours.

15. After quitting Chesty Foods, the Plaintiff opened his own welding and machine shop. The success of this now defunct endeavor is unknown.

16. In 1986, the Plaintiff was employed by Alloy Crafts in Delphi, Indiana. The positions he held included welder, fitter, maintenance man, and job leader. He made $8.88 per hour. His reason for leaving is unknown.

17. Later in 1986, the Plaintiff was employed at Kurland Steel in Champaign, Illinois. There he was a lay-out maintenance worker earning $10.00 per hour. He quit this job because he could not afford to move.

18. In 1986, the Plaintiff received an Indiana ITT license for teaching welding and machine shop. The license has since expired.

19. The Plaintiff's children receive free lunches and assistance for school book expenses.

20. The debtors' SCHEDULE OF CURRENT INCOME AND CURRENT EXPENDITURES FOR INDIVIDUAL DEBTOR ("Schedule") (Plaintiff's Exhibit 1) shows that the monthly net income to the Plaintiff and his family is $1,450.00 excluding income earned by any of the children. The total expenses are $1,622.41. Of this total, $373.41 are "estimated expenses" for such things as a car payment, health insurance, and auto insurance. At the time of trial, the Plaintiff did not own a car or pay car or health insurance. Therefore, the current actual monthly expenses are $1,249.00. This leaves an excess of approximately $200.00 per month.

21. The debtors' amended Schedule A–3 filed July 8, 1988 shows a total unsecured indebtedness of $17,746.10.

22. The debtors' Schedule sets out the following:

Current Monthly Net Income:
Debtor     $1,075.00
Spouse     375.00

TOTAL:   $1,450.00

Current Monthly Expenditures:

| | Actual | Projected |
|---|---|---|
| | $ | $ |
| Rent | 200.00 | |
| Utilities | 239.00 | |
| Insurance: Health | | 123.41 (estimated) |
| Auto | | 70.00 (estimated—debtor does not own a car) |
| Renters | 15.00 | 150.00 |
| Car payment | | |
| Transportation | 100.00 | |
| Food | 500.00 | |
| Clothing | 125.00 | |
| Medical/Dental/Rx | 75.00 | |
| Laundry/Cleaning | 25.00 | |
| Total Expenditures | $1,279.00 | $343.41 |

23. The $4,569.94 debt owed to the Defendant comprises approximately 26% of the total unsecured debt owed by the Plaintiff.

*Discussion*

The Plaintiff seeks to have the indebtedness evidenced by his student loans held dischargeable under the exception set out in 11 U.S.C. § 523(a)(8)(B). That section states in pertinent part:

11 U.S.C. § 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228[a] 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution, unless—

(A) such loan first became due before five years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8)(A) and (B).

The court is unable to determine and the parties have not stated exactly when the loan became due and payable. However, it is obvious that the loans did not become due before five years prior to the date of the filing of the bankruptcy petition because the dates of the loans were in March and April of 1987. As a result, the dischargeability of the Plaintiff's student loans turns on a finding by the court of "undue hardship." 11 U.S.C. § 523(a)(8)(B).

Neither Bankruptcy Rules nor § 523 allocate the burden of proof in dischargeability proceedings. Therefore, the courts will be guided in this determination by the particular sub-section of § 523 under consideration, its legislative history and related court decisions. It is apparent, particularly when it is the debtor bringing the complaint to determine dischargeability under the "undue hardship" exception, that the burden of proof is split between the parties according to issues. 11 U.S.C. § 523(a)(8)(B).

The court in *Financial Collection Agencies v. Norman (In re Norman)*, 25 B.R. 545, 548 (Bankr.S.D.Cal.1982) held:

[T]he creditor must establish the existence of the debt, that it is owed to or insured or guaranteed by a governmental agency or a non-profit institution of higher education, and that it first became due less than five years prior to the date the bankruptcy petition was filed.

It is a generally accepted principal that when deciding student loan dischargeability issues which are based upon a claim by the debtor of "undue hardship," that the burden of proof on the issue of "undue hardship" is on the debtor. *Binder v. United States Dept. of Education (In re Binder)*, 54 B.R. 736, 739 (Bankr.D.N.D. 1985). This is so because a claim of "undue hardship" is in the nature of an affirmative defense or an exception to the exception of such a debt from discharge. Herein, the Plaintiff does not contest the validity of the debt or his liability thereunder, but seeks instead to be relieved of that liability because of special circumstances. Placing the burden of showing "undue hardship" on the debtor is not contrary to the requirement that the creditor must initially prove its entitlement to a finding of nondischargeability. As Justice Holmes explained in a similar context:

By the very form of the law the debtor is discharged subject to an exception, and one who would bring himself within the exception must offer evidence to do so. [Citation]. But there is an *exception to the exception, . . .* and, by the same principle if the debtor would get the benefit of that he must offer evidence to show his right (emphasis added).

*Hill v. Smith*, 260 U.S. 592, 595, 43 S.Ct. 219, 220, 67 L.Ed. 419 (1923).

The separate allocation of burdens, one to the debtor and the other to the creditor is consistent with the legislative history of § 523(a)(8) which indicates that this "... provision is intended to be self executing and the lender or institution is not required to file a complaint to determine the nondischargeability of any student loan." S.Rep. No. 989, 95th Cong. 2d Sess. 79 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5865.

■ Therefore, the court finds that the burden of proof as to entitlement to a finding of nondischargeability is upon the Defendant; the burden of proof of "undue hardship" is upon the Plaintiff.

It is a well accepted principle of statutory construction that statutes are to be interpreted so that they carry out the intent of the legislature, and bankruptcy courts have generally applied § 523(a)(8)(B) narrowly. *Connecticut Student Loan Foundation v. Keenan (In re Keenan)*, 53 B.R. 913, 918 (Bankr.D.Con.1985). It is not enough that repayment of the student loan impose a hardship upon the debtor. The fact that the debtor's budget may be tight for the foreseeable future is the norm rather than the exception. *United States v. Collier (In re Collier)*, 8 B.R. 909, 911 (Bankr.S.D.Ohio 1981). Most, if not all debtors could make this hardship claim in good faith. *Keenan*, 53 B.R. at 918, so more is needed than present inability to pay. *Abrams v. University of Nebraska at Lincoln (In re Abrams)*, 19 B.R. 64, 66 (Bankr.D.Neb.1982).

The words "undue hardship" are not defined in the Bankruptcy Code. Instead they are words of art to be interpreted in the discretion and judgment of the court. *Courtney v. Gainer Bank (In re Courtney)*, 79 B.R. 1004, 1010 (Bankr.N.D.Ind. 1987). The determination of whether repayment of the school loan will cause an "undue hardship" is inherently a question of fact for the court's discretion, based on the particular circumstances of the case. *Id; Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir.1981). To limit these terms of art to inflexible dictionary definitions would be to defeat the policies of the section which look to the court's discretion on a case by case basis. *Abrams*, 19 B.R. at 65. *Report of the Commission on Bankruptcy Laws of the United States* at H.R.Doc. No. 137, 93rd Cong. 1st Sess. (1973).

■ Therefore, the court finds that whether a discharge will be granted turns

on the facts and circumstances of each particular case. *Courtney*, 79 B.R. at 1010.

A debtor has not established "undue hardship" merely by proof that continued liability for repayment of his school loans would bring about "an unpleasantness" or a "garden variety hardship." *Lezer v. New York State Higher Education Services Corp. (In re Lezer)*, 21 B.R. 783, 787 (Bankr.N.D.N.Y.1982).

There is no universally accepted, tried-and-true test that unerringly renders a finding of "undue hardship." The bankruptcy courts faced with this issue have considered a variety of factors including: illness, incapacity or other extenuating circumstances, *Report of the Commission on the Bankruptcy Laws of the United States*, H.R.Doc. No. 137, 93rd Cong., 1st Sess., pt. 1, at 176 (1973); more than present inability to pay, *Abrams*, 19 B.R. at 66; total incapacity now and in the future to pay one's debts for reasons not in the control of the debtor, *Rappaport v. Orange Savings Bank (In re Rappaport)*, 16 B.R. 615, 617 (Bankr.D.N.J.1981); presence "... of such unique circumstances to render it less likely or likely only with extreme difficulty or unlikely at all, that the bankrupt will within the foreseeable future be able to honor his commitment;" *Georgia Higher Education Assistance Corp. v. Densmore (In re Densmore)*, 8 B.R. 308, 309 (Bankr.N.D.Ga.1979); whether a debtor has made a good faith effort to negotiate a deferment or forbearance of payment, *Rice v. University of South Dakota (In re Rice)*, 13 B.R. 614, 617 (Bankr.D.S.D.1981); was the alleged "undue hardship" "self imposed," *Holzer v. Wachovia Services, Inc. (In re Holzer)*, 33 B.R. 627, 631 (Bankr.S.D.N.Y.1983); the hardship that will result must be long-term, *Georgia Higher Education Assistance Corp. v. Bowen (In re Bowen)*, 37 B.R. 171, 172–73 (Bankr.M.D.Fla.1984); the debtor's financial status in relation to the poverty guidelines, *Bryant v. Pennsylvania Higher Education Assistance Agency (In re Bryant)*, 72 B.R. 913, 917 (Bankr.E.D.Pa.1987); has the debtor made any payment on the student loan, *Shoberg v. Minn.*

*Higher Education Coordinating Council (In re Shoberg)*, 41 B.R. 684, 688 (Bankr.D.Minn.1984); has the debtor had any resources to make payments on the student loan, *Pennsylvania Higher Education Assistance Agency v. Birden (In re Birden)*, 17 B.R. 891, 894 (Bankr.E.D.Pa.1982); is there permanent or long term disability of the debtor, *In re Wilson*, 76 B.R. 19, 20 (Bankr.D.R.I.1987); the debtor's living expenses and the reasonableness of those expenses, *Andrews*, 661 F.2d at 704; the existence of medical expenses or problems, *Diaz v. New York State Higher Education Services Corp. (In re Diaz)*, 5 B.R. 253, 254 (Bankr.W.D.N.Y.1980); unusual responsibilities arising from the needs of a dependent, *Bennett v. Commerce Bank of Independence (In re Bennett)*, 38 B.R. 392, 395 (Bankr.W.D.Mo.1984); has the education obtained through the use of the school loan been of use to the debtor, *Powelson v. Stewart School of Hairstyling, Inc. (In re Powelson)*, 25 B.R. 274, 276 (Bankr.D.Neb. 1982); an examination of the debtor's present and future financial situation including the debtor's employment history and possible prospects of future income, *North Dakota State Board of Higher Education v. Frech (In re Frech)*, 62 B.R. 235, 241 (Bankr.D.Minn.1986); the ability of the debtor to gain employment in the arained, *Georgia Higher Education Assistance Corp. v. Bell (In re Bell)*, 5 B.R. 461, 463 (Bankr.N.D.Ga.1980); the excess of the debtor's expenses over income, *Rice*, 13 B.R. at 617; the time span between leaving school, the due date of the loan, and the filing of the petition, *Love v. Dept. of Health, Education and Welfare (In re Love)*, 28 B.R. 475, 478 (Bankr.S.D.Ind. 1983); has the debtor made a good faith effort to maximize income and minimize expenses, *Pennsylvania Higher Education Assistance Agency v. Johnson (In re Johnson)*, 5 Bankr.Ct.Dec. (CRR) 532, 537–38 (Bankr.E.D.Pa.1979); does the debtor have the present or future ability to repay the loan, *Junior College District of Metropolitan Kansas City v. Osborne (In re Osborne)*, 72 B.R. 691, 693 (Bankr.W.D. Mo.1987); the existence of reaffirmation

agreements with other creditors, *Vermont Student Assistance Corp. v. Ewell (In re Ewell)*, 1 B.R. 311, 313 (Bankr.D.Vt.1979); was the dominant purpose of the bankruptcy petition to discharge the student loan, *Johnson*, 5 Bankr.Ct.Dec. (CRR) at 540–41; does the debtor have excess income within his budget to repay the student loan, *Maschka v. Nebraska Higher Education Loan Programs (In re Maschka)*, 89 B.R. 816, 818 (Bankr.D.Neb.1988); ratio of the student loan to the total indebtedness, *Erickson v. North Dakota State University (In re Erickson)*, 52 B.R. 154, 159 (Bankr. D.N.D.1985); the effect of the debtor's course of work on his future earning capacity, *In re Fonzo*, 1 B.R. 722, 724 (Bankr.S. D.N.Y.1979).

A major disparity exists, however, in the various courts' interpretations of the term "undue hardship." Some courts lean towards a liberal application finding that the "... court must, therefore, strike a balance between the concerns of Congress for those cases of extreme abuse of student loans[1] and the principles of fresh start and equality associated with bankruptcy relief." *Ford v. New York State Higher Education Services Corp. (In re Ford)*, 22 B.R. 442, 444–45 (Bankr.W.D.N.Y.1982). Other courts take a hard-line stand by requiring that only debtors "... severely disadvantaged economically as a result of unique factors which are so much a part of the bankrupt's life, present and in the foreseeable future, that the expectation of repayment is virtually nonexistent, unless by that effort the bankrupt strips himself of all that makes life worth living." *In re Kohn*, 5 Bankr.Ct.Dec. (CRR) 419, 424 (Bankr.S.D.N.Y.1980).

Because the nondischargeability provision of § 523(a)(8) was made self-executing to prevent a perceived abuse[2], Congress allowed an exception for those who could show that repayment of the student loan would cause "undue hardship." An exhaustive and complex analysis of the "undue hardship" exception was set out by Judge Twardowski in the *Johnson*[3] case wherein he adopted a tri-level test. The first level was a mechanical comparison of financial resources and expenses in light of the debtor's educational level, skills, ability to retain employment, and work history. The next level involved a good faith analysis and presupposed that the debtor could pass the mechanical test. The good faith analysis analyzed whether the debtor had exerted his best efforts to maximize his income and to minimize his expenses and looked to whether the debtor's insolvency was due to factors within or beyond the debtor's control. The final level, the policy test, required the court to look at 1) whether the dominant purpose of the debtor's filing was to discharge the student loan liability, and 2) did the education gained by the debtor enhance the debtor's learning capacity. The debtor must prevail on all three levels or the debt was deemed nondischargeable.

Similarly, the method of determining whether the facts of a particular case fit within the rationale of the exception was explained by the Commission on Bankruptcy Laws when it stated:

In order to determine whether non-dischargeability of the debt will impose an "undue hardship" on the debtor, the rate and amount of his future resources

---

**1.** Congress was concerned about debtors with large amounts of school loans, few other debts, and well-paying jobs who had filed bankruptcy shortly after leaving school and before any loans came due. H.R.Rep. No. 595, 95th Cong., 1st Sess. 133 (1977) *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6094.

**2.** The amendment was adopted in the light of testimony that the bankruptcy rate involving student loans had increased significantly in the last several years and that in some areas of the country students were being counselled on filing for bankruptcy to discharge their obligations to repay guaranteed loans. The Com-

mittee noted that in most circumstances a student may leave school with several thousand dollars in student loans and no assets, thereby making the student technically eligible to declare bankruptcy. The amendment, by waiting five years, offered a more realistic view on the student's ability to repay a student loan. H.R. Rep. No. 1232, 94th Cong., 2nd Sess. 13–14 (1976). *Bell*, 5 B.R. at 463.

**3.** *Pennsylvania Higher Education Assistance Agency v. Johnson (In re Johnson)*, 5 Bankr.Ct. Dec. (CRR) 532 (Bankr.E.D.Pa.1979).

should be estimated reasonably in terms of ability to obtain, retain and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents at a minimal standard of living within their management capability, as well as to pay the educational debt. *Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. No. 137, 93rd Cong., 1st Sess., pt. 2 at 140–41, n. 17 (1973). *Bell,* 5 B.R. at 463.

4. "The court holds that a simple economic, ability-to-pay in the future test based upon the debtor's estimated future income and expenses is the standard that should be applied. Thus, the court holds that the nature of the court's inquiry should center on the mechanical test and good faith test of whether expenditures have been minimized, resources have been maximized, and efforts have been made to obtain employment, as enunciated by the *Johnson* court and not on the policy test. The court also rejects the criteria of the *Kohn* court, *supra* as going too far and seems to employ an almost Draconian test going beyond undue hardship.

The court also declines to adopt the federal poverty guidelines test used by the court in *In re Bryant, supra....*

The mechanical and good faith tests set out by the *Johnson* court and the test set out in the Bankruptcy Commission Report, *see,* pages 5 and 6, *supra,* appear to this court to be a most objective and forthright tests.... The fact that the debtor resorts to his statutory right to file a bankruptcy and to discharge his debts, which may include student loans, where the primary motive for filing is to discharge a student loan or loans or where the debtor has a large percentage of debt allocated to student loans should not in itself bar a discharge....

Accordingly, the court will restate the test as set out by the Commission Report, *supra,* in terms of enumerated factors or elements so that the standard which the court will apply is clarified.

In order to determine whether a student loan should be dischargeable because of undue hardship, the court will consider the following:

1. A reasonable estimation of the rate and amount of the debtor's future resources in terms of the following:

A) The ability to obtain, retain, and continue employment and the rate of pay that can be expected.

B) Any earned income or wealth which the debtor can be expected to receive.

Examples of the extent of disparity among courts can be found within Indiana. In the Northern District of Indiana, it has been held "... that a simple economic, ability-to-pay in the future test based upon the debtor's estimated future income and expenses is the standard that should be applied" and eschews the use of any form of policy as suggested in the *Johnson* analysis other than the five year discharge exception set out in § 523(a)(8)(A).[4] *Courtney,* 79 B.R. at 1013. The Southern District of Indiana utilizes an amended *Johnson* tri-level test which adds two additional factors to the policy test.[5] *Love,* 28 B.R. 478.

2. Whether the total amount of income, its reliability and periods of its receipt are adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capabilities, as well as pay the educational debt.

In addition, the mechanical and good faith tests of the *Johnson* court will be applied." *Courtney,* 79 B.R. at 1013–14.

5. In determining how the court would analyze and interpret the "undue hardship" exception of 11 U.S.C. § 523(a)(8)(B), Judge Kearns reasoned that "many courts have struggled with attempting to formulate standards by which to judge adequately, and with an acceptable level of consistency, what constitutes 'undue hardship.' The most exhaustive and complex analysis of this situation was offered by the court of the Eastern District of Pennsylvania, *In re Johnson* B.C.D. [sic] 532, in which a tri-level test was adopted. The first part of it was strictly a mechanical test, comparing financial resources and expenses in light of the debtor's skills, educational level, employment record, and ability to retain employment. The second level, assuming the debtor could pass the mechanical test, was a good faith test which looks at whether the debtor has made an attempt to maximize income and minimize expenses, and whether the debtor's insolvency was due to factors within or beyond the debtor's control. Finally, the *Johnson* court had a policy test which looked at two factors, one, whether the dominant purpose of the bankruptcy was to escape liability for the student loan, and, two, whether the education obtained through the loan had enhanced the debtor's learning capacity. If the debtor failed on any of these three levels to prevail, the debt was deemed to be nondischargeable.

This court is of the opinion that this exhaustive test, thought very useful, is perhaps not exhaustive enough and needs to be amended before it is adopted for use in this case. With regard to level one of the policy test, whether the dominant purpose of the bankruptcy was to

Rigid adherence by the court to a particular test robs the court of the discretion envisioned by Congress in drafting § 523(a)(8)(B). The court finds that the more equitable approach is to view each case in the totality of circumstances involved.[6] *Clay v. Westmar College (In re Clay)*, 12 B.R. 251, 255 (Bankr.N.D.Iowa 1981); *Johnson*, 5 Bankr.Ct.Dec. at 536 (court applied a "checklist" test). A case by case analysis based on such factors as those set out above, allows the court to more uniformly manage the equities of each case in view of the legislative intent and policies of the Bankruptcy Code and the Government assisted/funded student loan programs.

A case, therefore, succeeds or fails on its own merits and particular circumstances. Rigid application of the "undue hardship" exception would work to penalize the truly honest and desperate debtor and clash with the notions of a fresh start and equity of distribution among the unsecured creditors. Setting forth the terms of the exception as that of "undue" hardship alleviates the "garden variety" hardship commonly found in all bankruptcy cases. *Frech*, 62 B.R. at 243. The court is hesitant to accept any one test as the be-all and end-all method of finding "undue hardship." An undefined and illusive concept such as "undue hardship" should result from a fact-sensitive analysis based on the totality of the circumstances distinguishable from other cases based on the debtor's own peculiar facts

and circumstances. *Clay*, 12 B.R. at 255. This is not to say, however, that the court will not rely on the other tests for guidance. With these policies, concepts, and notions in mind, the court will proceed to an analysis of the facts and merits of the case at bar.

The Plaintiff's threshold burden is to prove that he does not now and will not in the future, have the funds available from which to repay the student loan. While this question seems simple enough at first blush, the answer is, rather, the result of a complex analysis and series of hoops through which the court must jump before a determination and answer can be fashioned.

■ The debtors' Schedule must be the starting point. The current actual net income of the Plaintiff and his spouse is $1,450.00 per month. His current actual expenses are $1,279.00.[7] This leaves an excess in the debtors' budget of $171.00 per month. The court presumes that because the Plaintiff was recently employed at his current job he is aware of the actual cost of the medical insurance but will not be afforded the coverage until a probationary period is completed. If this is the case, the additional $123.41 per month insurance expense will still leave the Plaintiff with $47.59 excess in his budget. This remains within a few dollars of the federally regulated repayment schedule which requires the yearly payment to be the lesser amount

escape liability for the student loan, at least two other factors should be considered, being, one the length of time which has elapsed between the graduation or departure of the debtor from the program of instruction and the filing of the bankruptcy, and, two, the amount of money paid by the debtor on the obligation prior to the bankruptcy having been filed." *Love v. Dept. of Health, Education and Welfare (In the Matter of Love)*, 28 B.R. 475, 478 (1983).

**6.** In *Clay*, Judge Thinnes explained that "it is more than customary that this court endorses the 'totality of circumstances' approach. Certain facts in this case when viewed alone may justify nondischargeability. *E.g.*, 56% of the debtor's total debt is education-related; the debtor's disposable income of $144 may be more than marginal. *See, In re Hayman*, 4

Bankr.Ct. Dec. (CRR) 932, 932 (S.D.Fla.1978) (debtor with $30 disposable income denied discharge); *cf. In re Johnson*, 5 Bankr.Ct. Dec. (CRR) 532, 544 (E.D.Pa.1979) (discharge granted when only 30% of bankrupt's debt was education-related). It is not intended that facts in each case be viewed as discrete and single entities. Rather, a determination can be made only after viewing the facts as a whole; individual factors are not controlling." *Clay v. Westmar College (In re Clay)*, 12 B.R. 251, 255 n. 3 (Bankr. N.D.Iowa 1981).

**7.** *See, supra*, Findings of Fact ¶ 22, this figure does not include $123.41 for health insurance, $70.00 for car insurance, or $150.00 for a car payment, since these expenses are not currently being incurred by the debtor.

of the total due or $60.00.[8]

The court has no opinion on the issue of the necessity of an allowance in the debtors' budget for a motor vehicle. The Plaintiff has already included $100.00 per month for transportation in his budget. He does not now make car payments or auto insurance payments so the court is precluded from including those estimates and projections under actual monthly expenses.

Therefore, under the debtors' "checklist of factors"[9] the Plaintiff fails under the first factor because his budget does balance at this moment in time and the Plaintiff has excess funds from which to repay his student loans. *In re Maschka*, 89 B.R. at 89. However, even under the varied facets of the *Johnson* test,[10] the *Courtney* test,[11] and *Report of the Commission of Bankruptcy Laws of the United States*,[12] the analysis requires more than a mere "snapshot" of the debtor's financial circumstances at any given time. The court must chart and evaluate the Plaintiff's past employment history, rate of pay, skill and educational level, and speculate, with some certainty based on its analysis, the probability of the Plaintiff to obtain, retain, or continue employment and at what rate of pay. While an unenviable job, the facts of each case control its ease of application.

The court sees a good employment record for the Plaintiff since 1964. The Plaintiff began work at or about age eighteen and has had a steady history of above-average factory-type jobs at a mean rate of about $10.00 per hour. While he contends that his current job at Terre Haute Coke and Chemical may not last because of EPA threats of closing, there is ample evidence in his past employment history that he has survived at least two plant closings and still gone on to gain other comparable wages and work. His job history suggests that the Plaintiff has been able generally to command an average of $10.00 per hour for his labor and therefore his current wage of $7.50 per hour is below what he could predictably earn in another plant.

In addition, the Plaintiff's wife is employed part-time at minimum wage. There is no evidence of serious health problems that would preclude either the Plaintiff or his wife from continuing their employment or even increasing their schedules from part-time to full-time. The Plaintiff's eldest son, Donald, Jr., is also employed and earning $35.00 per week but this income does not appear in the debtors' Schedule. While the court realizes that his minor case of cerebral palsy affects his earning powers, they are by no means extinguished and his handicap is evidently not severe enough to warrant any disability income. Donald, Jr., has worked in the past and there is no evidence that he will not be able to work in the future. The Plaintiff contends that because of this disability, the Plaintiff and his wife will most likely be responsible for

---

8. 34 C.F.R. § 682.401(b)(9)(V); 20 U.S.C. § 1078(b)(1)(L); Pub.L. No. 97–35, § 537(b).

9. POST HEARING SUGGESTIONS OF THE PLAINTIFF/DEFENDANT at 2–5, which include 1) the budget must not balance; 2) dependents; 3) medical problems; 4) debtor's financial future; and 5) good faith.

10. The first part is strictly a mechanical test comparing financial resources and expenses in light of the debtor's skills, education level, employment record, and ability to retain employment. *Johnson*, 5 Bankr.Ct. Dec. (CRR) 536 (Bankr.E.D.Pa.1979).

11. "In order to determine whether a student loan should be dischargeable because of 'undue hardship,' the court will consider the following:
1. A reasonable estimation of the rate and amount of the debtor's future resources in terms of the following:

A) the ability to obtain, retain and continue employment and the rate of pay that can be expected.
B) any unearned income or wealth which the debtor can be expected to receive." *Courtney*, 79 B.R. at 1014.

12. "In order to determine whether non-dischargeability of the debt will impose an 'undue hardship' on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account." *Report of the Commission on the Bankruptcy Laws of the United States*, H.R. Doc. No. 137, 93rd Cong., 1st Sess., pt. 2 at 140–41 (Appendix 2) (1973), *reprinted in, Collier on Bankruptcy*, Appendix 2, L. King, (15th ed.).

Donald, Jr., throughout his life. There is, however, no reason to believe that Donald, Jr., could not be expected to contribute to the household expenses from his income. His income, while perhaps minimal, would nevertheless be available to the debtors' budget.

Under the first step of the tests set out above, and factor number four on the debtors' checklist,[13] the court finds that indeed the debtors' budget balances and the court has every reason to predict that the Plaintiff will be able to continue in his current job or comparable employment at or above his current hourly wage of $7.50, well into the foreseeable future.

The next step in the analysis and the debtors' fifth checklist factor,[14] requires the court to compare such things as the maximization of the Plaintiff's income,[15] the prudence of his expenses,[16] and the cause of the Plaintiff's insolvency.[17]

It appears as though the Plaintiff has demonstrated good faith in conducting his financial affairs. He has a regular and healthy employment history and good prospects for the future. Therefore, the court finds that he has succeeded in maximizing his income. His expenses, not including the expenses related to the potential purchase of a motor vehicle and health and auto insurance, show only necessities and there is no indication of more than frugal and prudent expenditures.

Factor number three on the debtors' checklist is "medical problems." The only medical problem the court can find that requires regular or constant treatment is the Plaintiff's high blood pressure. The Plaintiff takes regular medication at a cost of about $15.00 per week. The debtors' budget includes an expense for medical and dental in the amount of $75.00 per month. This expense appears to be adequately provided for by the household income.

When considering the debtors' checklist factor number two, "Dependents," the court cannot help but take notice of the fact that according to the Plaintiff's testimony, two of the Plaintiff's children are ages eighteen and nineteen and are currently seniors in high school. While the Plaintiff is currently supporting these children, upon their graduation in June of 1989 he will no longer be legally responsible for either child. Therefore, it is logical to assume that they will soon become employed, if they are not already, and either continue to live at home and contribute to the household income, or instead move out of the house, thereby decreasing the Plaintiff's expenses. Unfortunately, the Plaintiff does not have the financial luxury to support adult children who are able to work and choose not to work, or who are employed and refuse to contribute to the household income. The Plaintiff's son Donald Jr., while mildly handicapped, has minimal income from a job which he does not contribute to the household. There appears to be no reason that his employment will stop, and may yet improve.

The *Report of the Commission on Bankruptcy Laws of the United States* and the *Courtney* court part ways with the *Love* test at this point by refusing to consider policy guidelines. The *Love* court has enhanced the third level of the *Johnson*

---

13. Debtor's financial future.

14. Good faith in conducting financial affairs.

15. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents at a minimal standard of living within their management capability, as well as to pay the education debt. *Report of the Commission on the Bankruptcy Laws of the United States,* H.R. Doc. No. 137, 93rd Cong., 1st Sess., pt. 2 at 140, 141 (1973), *reprinted in Collier on Bankruptcy,* Appendix 2, L. King, (15th ed. 1988).

16. "Whether the total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capability, as well as to pay the education debt." *Courtney,* 79 B.R. at 1014.

17. "The second level, assuming the debtor could pass the mechanical test, was a good faith test which looks at whether the debtor has made an attempt to maximize income and minimize expenses, and whether the debtor's insolvency was due to factors within or beyond the debtor's control." *Love,* 28 B.R. at 478.

tri-level test [18] by adding two additional factors to the policy analysis, those being 1) the length of time which has elapsed between the debtor's departure from the educational program and the filing of the bankruptcy petition, and, 2) the amount of money paid by the debtor on the student loan prior to the filing of the bankruptcy petition. *Love*, 28 B.R. at 478.

The *Love* court reasoned that the legislative history of § 523(a)(8) was particularly concerned about the abuse of the bankruptcy discharge by a debtor who graduates from an educational program with a large amount of student loans and before the debtor even begins the journey through his working life, he files a bankruptcy petition because nearly all of his debt is in the form of student loans and receives a discharge before having paid anything on them. *Id.* The *Love* court also rejected the *Johnson* "slip once and you lose" [19] approach as mechanical and unfair and instead chose to balance the findings at each level of the test by relying upon the relative strength of the facts of each case. The *Love* court justified the additional factors to the policy analysis by relying on the five year exception to discharge that Congress specifically included in § 523(a)(8).[20] As can be seen by the current federal budget problems, the federally-sponsored school loan programs are in jeopardy of extinction. It is painstakingly obvious that a major contributing factor to the program's demise is the percentage of uncollectible loans. It would be illogical to believe that Congress would on one hand dole out money for student loans and then on the other hand guillotine that program by allowing the bankruptcy court to freely and with reckless abandon,

order the discharge of student loans without a strong showing of "undue hardship."

It is clear that more than mere "garden variety" immediate hardship is necessary. Only the presence of exigent or exceptional long term circumstances beyond the control of the Plaintiff which would preclude him from paying back the student loan, will necessitate a finding by the bankruptcy court that to except the debt from discharge would cause "undue hardship" for the debtor. Congress has specifically provided the necessary escape valve in § 523(a)(8)(B). It is therefore incumbent upon the bankruptcy court to weigh the policy and program ramifications before making a finding of the dischargeability of an otherwise nondischargeable debt. The court empathizes with the plight of the Plaintiff and finds that he and his family have persevered through great adversity in the face of more than one job loss because of plant closings, but nonetheless feels that the Plaintiff can rise above his misfortune.

The Plaintiff has maximized his income by remaining steadily employed and his expenses do not appear to be excessive or luxurious. He has made no payment on the student loan debt. There is no evidence that he asked for a forbearance or deferment of payments or that he attempted to renegotiate the loan. He received the benefit of the training and despite his driving while intoxicated convictions, he did get a job driving a semi-trailer for North American Van Lines in Fort Wayne, Indiana. He quit the job because of disillusionment with the job's demands, made no attempts to repay the loan or work out the debt, and

**18.** The final level of the *Johnson* analysis included the policy test which looked at 1) whether the dominant purpose of the bankruptcy was to escape liability for the student loan, and 2) whether the education enhanced the debtor's learning capacity. *Johnson*, 5 Bankr.Ct. Dec. (CRR) at 542–44.

**19.** The *Johnson* court held that if the debtor failed to prevail on any of the three levels, the debt was deemed to be nondischargeable. *Johnson*, 5 Bankr.Ct.Dec. (CRR) at 544–45.

**20.** "If time were not considered by Congress to be a factor, certainly 11 U.S.C. § 523(a)(8)(A)

would not have been written into the Code. This provision states roughly that after five (5) years there is no problem with the dischargeability. The debtor herein missed being covered by this provision by a matter of a few months. Is the court to assume that the policy reasons for non-dischargeability of this particular type of debt remain constant for five (5) years and then disappear altogether at the five (5) year point? It strains credulity to believe that that is so, and therefore the court believes it is entirely justifiable to consider the time factor." *Love*, 28 B.R. at 479.

now seeks to have the debt discharged. Merely because he is not now or may never be employed in a job which resulted from the education gained by the school loan is not enough to rise to "undue hardship." *In re Kohn,* 5 Bankr.Ct.Dec. (CRR) 419, 424 (Bankr.S.D.N.Y.1979). He will not now be heard to complain that he did not benefit from the education and training.

Therefore, the court finds that the Plaintiff has failed to bring himself within the exception of § 523(a)(8)(B) by failing to demonstrate that he is unable to earn sufficient income to maintain himself and his dependents and repay his student loan[21] and in fact has shown that a surplus exists in his budget from which to repay the student loan.

### Conclusions of Law

1) The court finds that the Plaintiff has failed to demonstrate that excepting from discharge his student loan debt to the Higher Education Assistance Foundation would impose an "undue hardship" upon the debtor.

2) The Plaintiff has sufficient means and income to repay the debt to the Higher Education Assistance Foundation, now and in the foreseeable future.

Based on the foregoing analysis, the court finds the Plaintiff's school loan debt to the Higher Education Assistance Foundation NONDISCHARGEABLE.

SO ORDERED.

---

21. The Commission on Bankruptcy Laws of the United States recommends that student loans "should not as a matter of policy be dischargeable before he (debtor) has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the education debt." *Report of the Commission on the Bankruptcy Laws of the United States,* H.R. Rep.Doc. No. 137, 93rd Cong., 1st Sess., pt. 2 at 140, n. 15 (1973); *Courtney,* 79 B.R. at 1007.