In re Stewart J. CORRELL and Sharon M. Correll a/k/a Sharon Adams, Debtors.

Stewart J. CORRELL and Sharon M. Correll a/k/a Sharon Adams, Plaintiffs,

v.

UNION NATIONAL BANK OF PITTS-BURGH; Edinboro University of Pennsylvania; United States of America; and Pennsylvania Higher Education Assistance Agency, Defendants.

In re Fred A. RUGH and Kathy J. Rugh, Debtors.

Fred A. RUGH and Kathy J. Rugh, Plaintiffs,

v.

HIGHER EDUCATION ASSISTANCE FOUNDATION and Chase Manhattan Bank, N.A., Defendants.

In re Ralph M. GRAVANTE and Jimilene Gravante, Debtors.

Jimilene GRAVANTE, Plaintiff,

v.

PENNSYLVANIA HIGHER EDU-CATION ASSISTANCE AGENCY, Defendant.

In re Jo Ann LEDGERTON, Debtor.

Jo Ann LEDGERTON, Plaintiff,

v.

PENNSYLVANIA HIGHER EDU-CATION ASSISTANCE AGENCY, Defendant.

In re Stephen P. MILES and Leslie A. Miles, Debtors.

Stephen P. MILES and Leslie A. Miles, Plaintiffs,

v.

PENNSYLVANIA HIGHER EDU-CATION ASSISTANCE AGENCY and

Hamlin Bank and Trust Company, Defendants.

Bankruptcy Nos. 87–00235E, 88–00466E, 88–01610 PGH, 89–0051 PGH and 88–00348E.

Adv. Nos. 88–0085, 88–0097, 88–0417, 89–0040, 89–0005.

United States Bankruptcy Court, W.D. Pennsylvania.

Oct. 4, 1989.

K. Kevin Murphy, Harrisburg, Pa., for Pennsylvania Higher Educ. Assistance Agency.

Michael G. Nelson, Erie, Pa., for Stewart J. Correll and Sharon M. Correll.

Scott W. Schreffler, Seneca, Pa., for Fred A. Rugh and Kathy J. Rugh.

Robert W. Parker, Jr., Erie, Pa., for Higher Educ. Assistance Foundation.

Harry M. Montgomery, Pittsburgh, Pa., for Jimilene Gravante.

Herbert G. Mitchell, Jr., Hillar, Pa., for Jo Ann Ledgerton.

Ronald P. Langella, Bradford, Pa., for Stephen P. Miles and Leslie A. Miles.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

### Issue

The sole issue for determination in each of these adversary proceedings is whether, upon the facts of each case, repayment of educational loans would subject the debtor to "undue hardship" so as to entitle the

debtor to be discharged from liability for the debt under 11 U.S.C. § 523(a)(8)(B).

## Discussion

The identical legal issue is to be resolved in each of these proceedings. We have, therefore, consolidated the resolution for reasons of efficiency, judicial economy and clarity.

Student loans are excepted from discharge under 11 U.S.C. § 523(a)(8), unless such loans have been due and owing for five (5) years or unless payment of such loans will impose an undue hardship on the debtor and the debtor's dependents.

None of the within student loans have been due and owing for five (5) years. Each debtor states that repayment of his/her student loan obligation would create an undue hardship and thus should be discharged under 11 U.S.C. § 523(a)(8)(B). Each creditor disagrees.

"Undue hardship" is not defined by the Code, but is left to the discretion and judgment of the court. *In re Ford*, 22 B.R. 442 (Bankr.W.D.N.Y.1982). Each bankruptcy case involving a student loan must be examined on the facts and circumstances in the individual case to determine whether repayment of the student loan obligation would create an undue hardship. *Ford* at 444, *In re Wegfehrt*, 10 B.R. 826, 829 (Bankr.N.D.Ohio 1981). The court must strike a balance between the concerns of Congress for those cases of extreme abuse of student loans and the principles of fresh start and equity associated with bankruptcy relief. *Ford* at 445.

The legislative history behind the student loan exception to discharge indicates a Congressional concern over abuse of the Bankruptcy laws where "individuals have financed their education and upon graduation have filed petitions under the Bankruptcy Act and obtained a discharge without any attempt to repay the educational loan and without the presence of any extenuating circumstances, such as illness." *See Report of the Commission on the Bankruptcy Laws of the United States*, H.R.Doc. No. 93–137, 93d Cong., 1st Sess., Pt. II 140, n. 14 (1973).

The Report of the Committee on the Judiciary, House of Representatives, indicated its concern with "a few abuses of the bankruptcy laws by debtors with large amounts of educational loans, few other debts, and well-paying jobs, who have filed bankruptcy shortly after leaving school and before any loans became due, . . ." *H.R.Rep. No. 595*, 95th Cong., 1st Sess., 133 (1977), reprinted in 1978 U.S.Code Cong. and Admin. News, p. 5787, 6094.

This legislative history indicates a Congressional policy of excepting discharge in those inequitable situations where debtors with superior education and employment skills were intentionally abusing the fresh start policies afforded by the bankruptcy laws.

We face the anomaly that rules as to the nondischargeability of educational loans apply to a wage earner at the poverty line, the same as to a high income physician.

It is apparent that judicially developed rules defining circumstances which indicate "abuse" of the bankruptcy system were developed to apply to high income professionals, but have come in recent years to be applied to poverty line wage earners. We conclude that the key word in the legislative history is "abuse" and that is inappropriate to apply the same standards to poverty line wage earners as is applied to high income professionals and other college graduates.

Students seek government-guaranteed student loans to attend schools of higher education to obtain enhanced skills, an increase in employability, and higher income levels.

Serious problems have developed in the goverment-guaranteed student loan programs. *U.S. Dep't. of Education, News Release* (June 1, 1989). Schools often promise to educate, but deliver only a debt. *Id.* Many schools concentrate on numbers of enrollees and profits rather than graduation rates and other educational outcomes. *Id.* The student leaves school with payments due on a [government] insured loan but no employable skill. *U.S. Dep't. of Education, Remarks Prepared for Stu-*

*dent Loan Default Reduction Initiative Announcement,* (June 1, 1989). These abuses are a major cause of student loan defaults. *Id.*

Recognizing this problem, the Department of Education has published new regulatory notices. *Dep't. of Education,* 34 C.F.R. § 668, § 682 (June 5, 1989). The regulatory notices contain consumer-information requirements designed to better inform students of their educational opportunities and their loan obligations. *Id.* In the past, students have had more consumer information about the cars they buy than the schools they attend. *U.S. Dep't. of Education, Remarks Prepared for Student Loan Default Reduction Initiative Announcement,* (June 1, 1989).

The Department of Education is submitting to Congress proposals for new laws to combat student loan defaults. *Id.* These proposals include an "ability to benefit" test to be given to prospective students prior to enrollment. We view the trade school loan program in retrospect—from the point in time where it is obvious that the "student" did not benefit, and perhaps could not benefit for lack of basic ability or prior prerequisite training, and perhaps should never have been permitted to enroll. The proposals also include a law prohibiting schools from employing commissioned individuals in recruiting or admissions activities. Again in retrospect, it is appalling that trade schools are permitted to sign up well-intentioned "students" by the use of commission salesmen who benefit by leading "students" into debt without appropriate guidance.

Workers enter trade school expecting to receive training which will qualify them for better employment and enable them to earn increased wages. When the training system fails, the "student" is unable to fulfill the expectations and then has the "educational" loan and other obligations which he is unable to repay, resulting occasionally in the filing of bankruptcy. This is not the intentional abuse of bankruptcy laws for which denial of discharge was intended as a remedy.

Several tests have developed which are normally applied to determine whether the facts of a case constitute undue hardship. *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395 (2nd Cir.1987), *In re Conner,* 89 B.R. 744 (Bankr.N.D.Ill.1988), *In re Bryant,* 72 B.R. 913 (Bankr.E.D.Pa.1987), *In re Craig,* 64 B.R. 854 (Bankr.W.D.Pa.1986), *In re Johnson,* 5 B.C.D. 532 (Bankr.E.D.Pa.1979). These tests include the mechanical test, the good faith test, and the policy test.

The mechanical test focuses on the debtor's expenses and future financial resources to determine if debtor's income is sufficient to support the debtor and his dependents at a minimal standard of living, as well as fund repayment of the student loan.

The Pennsylvania Higher Education Assistance Agency ("PHEAA") directs our attention to the poverty income guidelines established by the Federal Department of Health and Human Services and asserts that poverty level income ($10,060 for a family of three, $12,100 for a family of four) represents the amount necessary to maintain a minimal standard of living. PHEAA asserts that those persons earning income at or in excess of poverty level cannot be discharged of their student loan obligations in a bankruptcy proceeding.

We note that a family of three in Western Pennsylvania, with an annual income up to $26,300 qualifies for a home improvement grant from Pennsylvania State Department of Community Affairs Block Grant Money pursuant to guidelines published by the United States Department of Housing and Urban Development.

Certainly, block grant money would only be available to those considered to earn a minimal standard of living. Yet, the PHEAA urges this court to order repayment of student loans when family incomes are substantially less than the income permitted to qualify for public assistance in the form of home improvement grants.

Congressional concern over abuses in the bankruptcy system resulted in legislation that student loans would not automatically be discharged.

· Discharge of a "student" loan has been held to require severe economic disadvantages which is part of the bankrupt's present and foreseeable future. *In re Conner*, 89 B.R. 744 (Bankr.N.D.Ill.1988). The difficulties of the borrower must be such that, in looking ten years into the future, there appears no hope of an improved financial picture. *In the Matter of Marion*, 61 B.R. 815 (Bankr.W.D.Pa.1986).

■ We do not believe, however, that Congress intended a fresh start under the Bankruptcy Code to mean that families must live at poverty level in order to repay educational loans. Where a family earns a modest income and the family budget, which shows no unnecessary or frivolous expenditures, is still unbalanced, a hardship exists from which a debtor may be discharged of his student loan obligations. Use by the Bankruptcy Court of poverty level or minimal standard of living guidelines is not necessary to meet the congressional purpose of correcting

> "a few *abuses* of the bankruptcy laws by debtors with large amounts of educational loans, *few other debts*, and *well paying jobs*, who have filed bankruptcy shortly after leaving school." (Emphasis supplied)

We will therefore apply a less stringent standard.

■ The second inquiry is into the good faith of the debtor which examines the debtor's efforts to obtain employment, minimize expenditures, and maximize resources. Under this test, we also examine whether the dominant reason for filing the bankruptcy was to eradicate student loans; whether the student received a financial benefit from his/her education; and the time period between when the student loans were obtained and the filing of the petition in bankruptcy.

■ The third test is the policy test whereby the court attempts to determine whether discharging the student loan would frustrate the Congressional policy underlying 11 U.S.C. § 523(a)(8)(B).

It is in this light that we will examine the facts and circumstances of each proceeding.

### Correll

■ The debtor, Stewart J. Correll, filed an adversary proceeding to discharge his educational loan pursuant to 11 U.S.C. § 523(a)(8)(B), one to Edinboro University of Pennsylvania ("Edinboro"), guaranteed by the United States of America, Department of Education, and one to Union National Bank of Pittsburgh, guaranteed by PHEAA.

The loans were granted in 1981 and 1982, and thus were several years old when the instant bankruptcy was filed on May 4, 1987. The amounts claimed due by the creditors total $3,521.85.

The debtor withdrew from Edinboro in October 1983. Since that time, he has had employment as a bartender and is currently employed as a timber mill saw operator. The debtor earns a gross of $13,446 a year, resulting in take-home pay of $896 per month.

The debtor is married and has a 20 month old child. The family resides in a property owned by the debtor's father-in-law who allows debtor a reduced rent rate of $100 per month. Even with this special help, the debtor's monthly expenditures exceed his income.

The debtor received no commensurate benefit from his education. A large amount of debt was sustained. Debtor's employment since leaving the educational system has been limited to unskilled positions for minuscule wages. The debtor has been out of school for six years and is unable to maintain a minimal standard of living.

Income of the family is at or near the poverty level. No extra funds are available in the family budget. Without the help of family members in the form of rent reduction, this family may require assistance from public welfare.

The abuse of bankruptcy laws which Congress sought to prevent does not appear in this case. None of the good faith

or policy factors would prevent a discharge of the debtor's student loans.

The loans financing the debtor's higher education have not enabled him to earn a substantial income. The bankruptcy was not filed shortly after the debtor left school and before any student loan payment became due. The debtor simply cannot maintain a minimal existence for himself and his dependents and meet his student loan obligation.

The debtor's child is young. Substantial increases in income are unlikely. The skills learned in college do not qualify the debtor for higher paying positions. Periodic layoffs contribute to uncertainty in the debtor's financial situation. We see no economic relief for this debtor in the foreseeable future.

Based on the above factors, this court finds that the debts in question impose an undue hardship on the debtor. Added expenses of paying the student loans would violate the fresh start policy of the Bankruptcy Code. The debtor's student loans will be discharged. An appropriate order will be entered.

### Rugh

■ The debtors, Fred A. Rugh and Kathy J. Rugh, filed an adversary proceeding to discharge an educational loan owed by Fred A. Rugh ("debtor") to Chase Manhattan Bank, N.A., guaranteed by Higher Education Assistance Foundation, a non-profit Minnesota corporation (the "Foundation"), pursuant to 11 U.S.C. § 523(a)(8)(B).

The debtor was employed as a steel worker for over four years (1978–82) earning $16.00 per hour. In 1982, the factory shut down.

The debtor's good faith is unquestioned. Every effort has been made to minimize expenditures and maximize resources. After losing his job in a steel mill, the debtor attempted to continue payment of his debts while working a minimum wage job and incurred no new debt. To improve his skills and obtain better employment, the debtor chose to attend a trade school. Debtor attended the New Castle School of Trades and graduated with honors, receiving a "Doctor of Motors" degree.

To his dismay, debtor found the Doctor of Motors degree of no use. He did not have a state inspection license nor any Automotive Service Council (ASC) certifications required for employment in the automotive field.

The debtor is indebted for a student loan in the amount of $2,501.07 incurred for vocational education at New Castle School of Trades.

As discussed by the Secretary of the United States Department of Education, far too many school operators are exploiting America's neediest people and their dreams for a new start in life. They promise education and jobs which students never receive, leaving them deep in debt.

Debtor's "Doctor of Motors" degree exemplifies this problem. Debtor did not possess the necessary qualifications and skills to obtain employment upon completion of this program. He did possess a large debt. After all this effort, the debtor moved his family, left his home and took a job as a laborer for $6.25 per hour.

The purpose of the debtor's petition in bankruptcy was to align his expenses with the reduction in income caused by the closing of the steel mill and loss of debtor's employment. Debtor had been earning $16.00 per hour. He had purchased a modest home and obtained the normal amount of consumer debt. Loss of his job created financial difficulties which caused the filing of his petition in bankruptcy. The student loan was not the purpose of debtor's filing. The student loan was for education to enable debtor to correct his financial problems. This did not happen. It only added to the debtor's burden.

Although the debtor has minimized his expenses, living in an inexpensive dwelling and expending no income for luxury or frivolous items, his income is insufficient to pay these expenses. The debtor supports a wife and two children. They borrow from relatives and friends to pay minimal expenses. The debtors are eligible for public assistance in the form of food stamps. Although the debtor's current job appears

stable, there is little chance of substantial increases in pay. He does not qualify for higher paying positions. The debtor cannot now and will not be able in the future to maintain a minimal existence for himself and his dependents and meet his student loan obligations.

The abuse which Congress sought to prevent does not appear in this case. We do not have a highly-educated debtor filing for bankruptcy relief to avoid his student loan obligations.

This court finds that the debt in question imposes an undue hardship on the debtor. Added expenses of paying the student loan would violate the fresh start policy of the Bankruptcy Code. The debtor's student loan will be discharged. An appropriate order will be entered.

### Gravante

■ The debtor, Jimilene Gravante, filed an adversary proceeding to discharge her educational loan due to PHEAA pursuant to 11 U.S.C. § 523(a)(8)(B).

The obligation was within a few months of being five years old when the instant bankruptcy was filed on June 15, 1988. The amount in question is $2,654.33.

The obligation is owed by the debtor on account of a medical office assistant training program which she attended and completed in 1983. At that time, she was a single parent and had two children, who are now aged 13 years and 11 years; now she also has two children aged 3½ years and 8 months. The course in question was interrupted during a hospitalization of debtor's son. The 11 year old son has hydrocephalus (fluid on the brain) requiring a shunt implant to be maintained and occasionally replaced.

Debtor's husband is employed as a field engineer and earns a gross of $27,000 a year, resulting in take-home pay of $1,693 per month. Debtor's husband was diagnosed in 1977 as a manic-depressive and required nine hospitalizations in seven years, prior to the marriage to debtor in the fall of 1984. Debtor supervises his self-administration of prescribed medication.

Shortly before the hearing, the parties had moved from a $200 per month apartment to a $375 per .month apartment; in the prior apartment, there were only two bedrooms, so the daughter was required to sleep on the couch in the living room.

The parties are also paying $50 per month to repay debtor's father for a post-petition loan to help make the residence-move. The parties pay $135 school tuition, $60 church offering, and $20 trumpet lessons per month. The school tuition is paid to a church school and it appeared that the family has a rather strong allegiance to their church.

Although the gross income of the debtor's husband appears to be substantial and, on the face of it, would appear to require an order that debtor should make some payment to PHEAA, we must conclude otherwise. The debtor seems to be the stabilizing influence in this family. The imposition of an obligation to pay the $2,600 due to PHEAA on top of this family's tight financial budget might disrupt that stability and cast all six members on the public welfare rolls. The debt was incurred prior to the time she was married and while the older children are also the children of the debtor's present husband, the fact that she incurred the debt while she was single and that the husband must pay for that debt some five or six years into the marriage might cause unacceptable strains.

Also, the $135 per month to the church for school tuition might also, on the face of it, appear to be an unnecessary expense. However, the parties' allegiance appears to be the other stabilizing influence in this precariously-balanced situation.

None of the good faith or policy factors would prevent a discharge of the debtor's student loan. The abuse which Congress sought to guard against is nowhere apparent here.

The debtor and her dependents maintain a minimal standard of living and no extra funds are available in the family's budget. Debtor received no benefit from her education and the debt was nearly five years old when the petition was filed.

It is clear to the court that the debt in question imposes an undue hardship on the debtor. The debtor's four children are young and the illnesses in the family will prevent her from seeking gainful employment over a long period of time. The husband's illness and history of frequent hospitalization render his income uncertain. Debtor's circumstances will not foreseeably change for the better, looking ten years into the future.

In consideration of this debtor's unique and extraordinary circumstances as shown by her lack of income, the uncertainty of her husband's income, child care responsibilities which are magnified by the family's illnesses, added expenses of paying the student loan would violate the fresh start policy of the Bankruptcy Code.

For the reasons stated above, the debtor's debt to PHEAA will be discharged. An appropriate order will be entered.

### *Ledgerton*

The debtor, Jo Ann Ledgerton, filed an adversary proceeding to discharge her educational loan due to PHEAA pursuant to 11 U.S.C. § 523(a)(8)(B).

Loans were obtained during the period from 1981 to 1983 to enable the debtor to pursue studies in the field of nursing. The debtor was struck by a patient and suffered injury. She was advised by her doctor that she could not continue in the field of nursing due to her inability to meet the lifting requirements.

During 1984–85, the debtor obtained additional educational loans to pursue travel agency studies. Notwithstanding the fact that the debtor received a certificate in that field of study, she subsequently could obtain only a *minimum wage* job as a travel agent.

In 1987 the debtor worked as an insurance agent earning gross commissions of $16,498. After incurring expenses associated with her duties as a saleswoman of $9,343, her net earnings were $7,155.

On December 27, 1987, the debtor suffered injury in a fall. The debtor has been unemployed since that time. She has been released by her doctor for work, but suffers from a partial permanent disability in the shoulder.

The debtor is divorced and has a three month old child. She receives no support from her former husband. The debtor is able to live because of help provided by her parents and public assistance in the form of a medical card and food stamps.

Congressional policy was not frustrated by this debtor. This is not a case where the debtor obtained a superior education and then filed bankruptcy to avoid paying her student loans. The debtor is unable to work in the nursing field. Her studies in the travel agency field have resulted in no commensurate benefit to the debtor. Since completing her education, the debtor has been unable to maintain even a poverty level of living.

Although the debtor has been released by her doctor to seek employment, the skills learned in college do not qualify the debtor for any skilled position. The debtor's child is three months old. The foreseeable future holds no economic relief for this debtor.

To force this debtor to pay the added expenses of a student loan in view of these facts would result in an undue hardship and violate the principles of fresh start in the Bankruptcy Code.

The debts of this debtor to PHEAA will be discharged. An appropriate order will be entered.

### *Miles*

The debtors, Stephen P. Miles and Leslie A. Miles, filed an adversary proceeding to discharge educational loans owed by Leslie A. Miles ("debtor") to PHEAA, pursuant to 11 U.S.C. § 523(a)(8)(B).

Loans were obtained by the debtor in 1985–86 to enable the debtor to attend Olean Business Institute. Subsequent to the debtor's petition for relief under Chapter 7 of the Bankruptcy Code on July 21, 1988, the debtor continued to attend school and completed the final course of the degree program in December 1988. The debtor officially graduated in May 1989 and re-

ceived her degree, "Associate in Occupational Studies—Medical Secretarial Science."

The debtor is thirty-two years of age. Neither she, nor anyone else in the family, suffers from any medical problems. The debtor has two children, ages twelve and five.

The debtor is currently employed part-time in a secretarial capacity by Prudential Insurance Company. Her husband is employed as a cellulating mill operator for Pittsburgh Corning Corporation. He has been so employed for nearly ten years.

The family income for 1988 totalled $27,928.95. The debtor states that current family income is $2,154.26 per month or $25,851.12 annually.

The debtor and her husband own their home on which they make monthly mortgage payments of $161.20. They have reaffirmed their auto loan with P.C. Federal Credit Union in the amount of $9,000 on which they are required to make bi-weekly payments of $152.24 for three years.

Family income is substantially above the poverty level. The debtor's circumstances reveal no extraordinary or uniquely different factors which would qualify the debtor for a hardship discharge of her student loan obligations.

Even if the debtor were terminated from her employment in the near future, as she states is a possibility, there is no reason to believe the debtor would not soon after procure alternate, suitable employment with her training obtained through the student loan obligation.

We have examined the debtor's living expenses. They allow for a Christmas club savings account and also provide $648 annually for home insurance. The amount allocated for home insurance is unreasonably large for a home costing $15,000.

Further, the debtor's automobile payment, which is paid as a payroll deduction, will be satisfied within three years. This will leave additional funds to enable repayment of the student loans. Also, the PHEAA loan here is a fresh loan. The training program which was financed was completed some nine months *after* the bankruptcy was filed.

We find that repayment of the debtor's student loan obligation would not cause the debtor an undue hardship as contemplated by 11 U.S.C. § 523(a)(8)(B). An appropriate order will be entered.