**In re James Martin LAW, SSN: 504–90–2960, Debtor.**

**James Martin LAW, Plaintiff,**

v.

**THE EDUCATIONAL RESOURCES INSTITUTE, INC., a/k/a "TERI", Defendant.**

**In re Lawrence Martin LAW, SSN: 504–18–9297, and Eunice Ione LAW, SSN: 507–30–1526, Debtors.**

**Lawrence Martin LAW and Eunice Ione Law, Plaintiffs,**

v.

**THE EDUCATIONAL RESOURCES INSTITUTE, INC., a/k/a "TERI", Defendant.**

Bankruptcy Nos. 91–40584, 92–40108. Adv. Nos. 92–4015, 92–4016.

United States Bankruptcy Court, D. South Dakota, S.D.

Oct. 12, 1993.

Mary Ann Galland, Sioux Falls, SD, for plaintiffs/debtors.

John C. Quaintance, Sioux Falls, SD, for defendant.

PEDER K. ECKER, Bankruptcy Judge.

The matter before the Court is a consolidation of two adversary complaints seeking to determine the dischargeability of a student loan debt based on the undue hardship provision of 11 U.S.C. § 523(a)(8)(B). Following discovery, a status conference was held, and in lieu of trial, the parties requested the Court make its determination based upon a stipulated record following the submission of written authority and argument.

## BACKGROUND

In the spring of 1990, James Martin Law [hereinafter "Debtor"], read a magazine advertisement about a course of study leading to a commercial pilot's license from a flight training program accredited by the Fort Scott Community College in Fort Scott, Kansas. Debtor, a high school graduate with twelve years' experience as a painter, opted for the career change, enrolled in the program, and agreed to pay, in advance, the $18,095 tuition for aircraft flight training and ground school instruction in fixed wing pilot courses. In July, 1990, Debtor moved from South Dakota to Fort Scott, Kansas, took up residence in a motel made available for students by the flight school's owner, Dallas Foster, and began the six-month course of study at Mistwood Aviation, Inc., a Kansas corporation located at the Fort Scott municipal airport, some six miles from Fort Scott Community College.

To finance this endeavor, Debtor executed a $20,000 promissory note in favor of South Shore Bank, Quincy, Massachusetts. Debtor's father, Lawrence Martin Law, co-signed the obligation. The Educational Resources Institute, Inc. [hereinafter "TERI"], a private, nonprofit corporation, guaranteed the student loan. All of the loan financing was completed at Mistwood Aviation, Inc., but loan proceeds were disbursed from the bank to the student loan processing center at Fort Scott Community College. The $19,200 proceeds were payable to Debtor and Fort Scott Community College. Debtor endorsed the check and delivered it directly to Dallas Foster, who was to remit $1,105 back to Fort Scott Community College for registration costs and fees. Pursuant to the loan agreement,

repayment began in August, 1990, consisting of 240 monthly payments of $216.75 each. Five monthly payments were made before the loan was defaulted upon.

Debtor began Mistwood Aviation's program in mid-July, spending approximately three hours each day in classroom training and one to three hours each day in flight training. By the first part of August, however, the schedule began to change as the flight school began to experience financial difficulties. Opportunity for flight training was often restricted or simply unavailable because there was no money to refuel planes. Dallas Foster assured students there was no need to worry—that the real problem was the fact city officials revoked the school's rights to the airport—and so the school would be moving to another location. Before this "remedy" became a reality, however, flight training was completely terminated because insurance coverage for the planes ceased to exist. Classroom instruction was also affected. Instructors refused to teach because they were not getting paid. One instructor teaching an instrument course had to be replaced by a student just completing the course when it was learned the instructor was not licensed to teach. Even student housing was affected when Dallas Foster lost the motel, forcing Debtor to live in an apartment on his own. Finally, late one night in mid-January, 1991, just five months after Debtor arrived at the school, students observed Dallas Foster taking files, computers, and possessions from the school. A sign was hung on the door announcing the school's closing. Dallas Foster disappeared for a period of time but was later arrested in Kansas City—apparently, he had gone to Europe soliciting foreign students and was collecting advance tuition fees. Eventually, Mistwood Aviation, Inc., filed a voluntary Chapter 7 bankruptcy petition in the District of Kansas.

Having spent five months at Mistwood Aviation, Inc., and having accumulated a $20,000 debt, Debtor was left with the equivalent of two or two-and-a-half weeks' training, only enough to pass a private pilot's license examination. But a private pilot's license is not marketable, and lacking funds to keep it current, Debtor let it lapse. Hoping to assuage their predicament, the students contacted Fort Scott city officials, an attorney, and, on two separate occasions—once before and once after the school closed—Fort Scott Community College, but no assistance was given. Fort Scott Community College did refund the $1,105 registration fees back to the bank, but told Debtor it was not responsible for losing the remaining $18,095.

Debtor returned to South Dakota at the end of January, 1991, and abandoned his plans to become a commercial pilot. Already in his early thirties, Debtor would have to start training all over again and believed he would be too old to compete against younger pilots looking for employment with commercial airlines or subcarriers. Instead, Debtor worked as a salesman at a Sioux Falls hobby store earning $3,707 taxable income in 1991. This amount was not sufficient to meet monthly obligations, and so Debtor filed a voluntary Chapter 7 bankruptcy petition August 20, 1991. The petition indicated Debtor's assets were $1,980 and liabilities, owed to six unsecured creditors, were $28,565.11 ($20,726.22 owed to TERI). At the time of filing, Debtor had no income and no monthly expenses. A Chapter 7 discharge was granted November 25, 1991, and this adversary complaint was filed April 9, 1992.

In the summer, 1992, Debtor moved again, this time so he could continue living with his parents in Springfield, Missouri. At the time depositions were taken in August, 1992, Debtor still had no income but was in the process of finding employment. The only expense was a $50 monthly reaffirmation payment for a second student loan obtained to pay living expenses while attending Mistwood Aviation, Inc. By the end of 1992, Debtor had earned $6,358 taxable income. Debtor is single, has never married, has no dependents, and is in good physical health.

Lawrence Martin Law was forced to quit a life-time career in sales in order to care for his wife, Eunice, who was also forced to

stop working after suffering a stroke. She remains in poor health. Unable to manage their financial affairs despite having sold their own airplane to help pay bills, the couple filed a joint voluntary Chapter 7 bankruptcy petition February 20, 1992. The petition listed assets as $101,935 and liabilities as $151,646. The schedules listed income as $1,524 per month and expenses as $1,741.45 per month. The couple listed 33 creditors, all holding unsecured claims, except one claim of $67,000, secured by their home. At the end of October, 1992, the secured creditor obtained relief from the automatic stay in order to foreclose upon the real property. Having surrendered their South Dakota residence at the age of 64, the couple moved to Springfield, Missouri, to be near a daughter. There, they rent a duplex and live on the same fixed income, but with fewer monthly obligations: 1) Rent—$500; 2) Food—$250; 3) Gas—$50; 4) Medication—$70; and 5) Utilities—Unknown. In addition, the couple stipulated to the nondischargeability of a $2,500 debt which created a monthly obligation of $125, but only through mid–1993. The couple owns no real property and only limited personal property, including a 1973 Chrysler automobile. They are both covered by a group health insurance plan. Lawrence intends to work part-time in Springfield, Missouri.

### DISCUSSION

 Student loans are nondischargeable in bankruptcy unless one of two exceptions apply: either the loan first came due more than seven years before the bankruptcy was filed or an undue hardship will occur if repayment is required. 11 U.S.C. § 523(a)(8)(A), (B). The general rule and its two exceptions were enacted to curb a specific kind of bankruptcy abuse—abuse by students who finance higher education and file bankruptcy petitions immediately upon graduation even though they may have well-paying jobs, few other debts, and no extenuating circumstances to justify discharging educational loan debt. *See Report of the Commission on the Bankruptcy Laws of the United States*, H.R.Doc. No. 93–137, 93d Cong., 1st Sess., Pt. II 140,

n. 14 (1973). It was also enacted over concern for the integrity of student loan programs, wanting to keep them intact so that funds would always be available for future students seeking higher education financing. *In re Palmer*, 153 B.R. 888, 893 (Bankr.D.S.D.1993), *quoting* 124 Cong.Rec. 1791 (1978) (remarks of Rep. Ertel); *In re Pelkowski*, 990 F.2d 737, 743 (3d Cir.1993). This impetus has created a strong policy against permitting debtors to escape repaying student loans. *Brunner v. New York State Higher Educ. Services*, 831 F.2d 395 (2d Cir.1987); *In re Conner*, 89 B.R. 744, 747 (Bankr.N.D.Ill.1988). Because Section 523(a)(8) was not enacted to deal with a particular kind of abuser but, rather, to deal with a particular type of abuse, the provision applies to all types of debtors responsible for student loan debt, be they maker, co-maker, student, or parent of a student. *In re Palmer*, 153 B.R. at 895. In contrast, the "undue hardship" exception focuses on the particular debtor. Student loan debt may be discharged if requiring repayment "will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8)(B).

 The Bankruptcy Code does not define "undue hardship," because limiting these "words of art" to an "inflexible dictionary definition" would defeat the discretionary interpretation of the facts in each case. *In re Ipsen*, 149 B.R. 583, 585 (Bankr.W.D.Mo.1992); *In re Clinton*, 133 B.R. 96, 97 (Bankr.N.D.Ohio 1991); *In re Webb*, 132 B.R. 199, 202 (Bankr.M.D.Fla. 1991); *In re Johnson*, 121 B.R. 91, 93 (Bankr.N.D.Okla.1990); *In re Correll*, 105 B.R. 302, 305 (Bankr.W.D.Pa.1989). *In re Andrews*, 661 F.2d 702, 704 (8th Cir.1981). Despite its discretionary nature, the interpretation does, nonetheless, contemplate the existence of unique and extraordinary circumstances, for the fact that repayment would merely impose a hardship is insufficient: "most or possibly all debtors could make a 'garden variety' hardship claim in good faith." *In re Foreman*, 119 B.R. 584, 587 (Bankr.S.D.Ohio 1990), *citing In re D'Ettore*, 106 B.R. 715, 718 (Bankr. M.D.Fla.1989); *In re Abrams*, 19 B.R. 64,

66 (Bankr.D.Neb.1982). Such a determination also means a debtor may not have created, either willfully or negligently, his own financial default, but, rather, the condition must have resulted from "factors beyond his reasonable control." *In re Roberson*, 999 F.2d 1132, 1136 (7th Cir.1993), *citing Report of the Commission on the Bankruptcy Laws of the United States* at 140 n. 16 (1973).

■■■ The debtor who invokes the "undue hardship" exception bears the burden of proving it exists. *In re Foreman*, 119 B.R. at 586; *Matter of Coleman*, 98 B.R. 443, 447 (Bankr.S.D.Ind.1989); *In re Binder*, 54 B.R. 736, 739 (Bankr.D.N.D.1985); *In re Keenan*, 53 B.R. 913, 916–17 (Bankr. D.Conn.1985); *Shoberg v. Minn. Higher Educ. Coordinating Council*, 41 B.R. 684, 687 (Bankr.D.Minn.1984). And to ensure the burden is met, courts have fashioned and endorsed a variety of tests. Two predominant tests were articulated in *In re Johnson*, 5 B.C.D. 532 (Bankr.E.D.Pa. 1979), and in *In re Brunner*, 46 B.R. 752 (Bankr.S.D.N.Y.1985). The *Johnson* test is really three tests in one, but if a debtor fails to pass any given test, the inquiry ends and the student loan is nondischargeable; otherwise, the court will progress to the next test: 1) a mechanical test which compares the debtor's financial resources and expenses in view of educational levels, skills, ability to retain work, and work history; 2) a good faith test which analyzes whether the debtor put forth best efforts to minimize expenses, to begin repaying the loan, and, which also analyzes whether the debtor created his own financial difficulties and insolvency; and 3) a policy test which asks if the primary motive for filing was to discharge the student loan debt and, if so, whether the debtor benefited financially from the education received. *In re Simons*, 119 B.R. 589, 592 (Bankr.S.D.Ohio 1990); *In re Correll*, 105 B.R. at 305; *Matter of Coleman*, 98 B.R. at 449; *In re Conner*, 89 B.R. at 747; *In re Frech*, 62 B.R. 235, 240 (Bankr.D.Minn.1986). The *Brunner* test also has three requirements, including a showing 1) that, based on current income and expenses, the debtor cannot maintain a "minimal" standard of living

for himself and any dependents if forced to repay the student loan; 2) that added circumstances exist to show this status is likely to continue for most of the repayment period; and 3) that the debtor has made a good faith effort to repay the loan. *In re Roberson*, 999 F.2d at 1134–35, *citing In re Brunner*, 831 F.2d at 396. *See also In re Ipsen*, 149 B.R. at 585; *In re Webb*, 132 B.R. at 202; *In re Garneau*, 122 B.R. 178, 179–80 (Bankr.W.D.N.Y.1990); *In re Bowen*, 37 B.R. 171, 172 (Bankr.M.D.Fla. 1984).

■■■ This Court hesitates to accept any one test as the be-all-end-all method for finding "undue hardship." Instead, it adopts a case-by-case approach that is fact-sensitive to the unique aspects of the case. *In re Evans*, 131 B.R. 372, 376 (Bankr. S.D.Ohio 1991); *In re Simons*, 119 B.R. at 593; *In re Correll*, 105 B.R. at 304; *Matter of Coleman*, 98 B.R. at 451. And while some of the circuits favor one test over another, this circuit has not adopted any particular "bright line" method of finding "undue hardship." In *In re Andrews*, this circuit's court stated necessary living expenses should be considered, which is consistent with the mechanical test in *Johnson*, but the court also found it was proper to consider additional circumstances such as long-term illness, which is consistent with the second test in *Brunner*. *In re Andrews*, 661 F.2d at 703–05. When compared, the various tests indicate nuances, or subtle shades of similar, overlapping requirements. A combined approach to finding "undue hardship" affords a determination that contextually considers both the debtor's situation and the policies underlying 11 U.S.C. § 523(a)(8). *In re Conner*, 89 B.R. at 747. For example, "good faith" efforts are considered in all "undue hardship" tests, but rather than endorsing any particular test, this Court simply found it was, contextually, one of the more significant considerations which helped to decide the case of *In re Rice*, 13 B.R. 614, 615 (Bankr.D.S.D.1981). Moreover, a case-by-case approach also ensures an appropriate, equitable balance will be struck: concern for cases involving extreme abuse and con-

cern for the overall fresh start policy associated with bankruptcy relief. *In re Correll*, 105 B.R. at 304, *citing In re Ford*, 22 B.R. 442, 445 (Bankr.W.D.N.Y.1982). As intended, the exception is narrowly construed. *In re Webb*, 132 B.R. at 201; *In re Keenan*, 53 B.R. at 916.

## DECISION

Debtor made a decision to embark on a course of study that would lead to a commercial pilot's license. The decision involved a personal and financial commitment. After Debtor and his father visited the training facility, spoke with the owner and instructors, and were satisfied with the apparent integrity of the program, Debtor was prepared to meet that commitment. After all, the school was accredited by and affiliated with a midwest community college and, certainly, there was no indication that the flight school was on course for disaster or that the owner of the flight training program would prove to be disreputable. But that was the case. Within five months, the owner of the flight training program disappeared, the school physically closed, and the school filed a voluntary Chapter 7 bankruptcy petition. Debtor received the equivalent of two or two-and-a-half weeks' worth of training and a private pilot's license, useless for employment purposes. The community college refunded the course registration fees but left Debtor dangling with the remaining loss.

This experience plunged Debtor $20,000 deeper in debt and, subsequently, into bankruptcy. Clearly, the school's disintegration was beyond Debtor's control. Despite false assurances that the students need not worry, the financial crisis which produced an immediate effect on the program's quality quickly escalated until the school was forced to close when its owner fled like a thief in the night. That forced Debtor to forfeit his education. This student loan was intended to pay for an education program leading to a commercial pilot's license. That program vaporized long before any benefit, financial or educational, was realized. Based on these circumstances, Debtor has not created the type of abuse intended to be remedied by 11 U.S.C. § 523(a)(8).

The real abuse is found with the community college, which was also quick to close its door of responsibility and accountability. Debtor and some of the other fifty students from Mistwood Aviation, Inc., made two pleas to the community college: the first was before the school closed, when students began to notice the effects of the school's financial problems. The students went to the dean of students at the community college, concerned about losing money because of what was "happening" at the school. The dean stated that, at that time, there was nothing the college could do. The second visit was after the school closed. The students asked for their money back. The college simply said it was not responsible. Unfortunately, the community college chose to play a purely perfunctory role—its only bona fide connection to Debtor as a student was as the student loan disbursement agent. The loss in this case belongs more appropriately to the college rather than these debtors. The real abuse was that the community college participated in a guaranteed student loan program but failed to monitor the quality of education being delivered by its affiliated fly-by-night flight training program. The education process is abused when educational institutions focus on recruitment activities and enrollment statistics and collect profits, while ignoring the responsibility to provide and deliver quality education. Without a doubt, Debtor did not receive the bargained-for education: how can it be beneficial to waste five months' time and energy earning a license that should have been earned in the first two-week period, which, even when earned, is not the requisite achievement for employment as a pilot?

The Court also finds there *was* a good faith effort to repay the loan. As scheduled, a steady stream of payments began in August, 1990, and continued through February, 1991, one month after the school actually closed. Debtor's "good faith" is further evidenced in the fact that the student loan used to finance living expenses

while at school has been reaffirmed and is being repaid.

In essence, these are the unique circumstances that favor a finding of "undue hardship." The financial considerations—current and future income versus expenses—must also be weighed, but in light of the overall facts, remain in the periphery:

● At the time of filing and still one year later when depositions were taken, Debtor had no income—his only "resources" were leftover proceeds from the reaffirmed student loan used to pay living expenses while at Mistwood Aviation, Inc., and the support he received by living with his parents. The only expense is a $50 monthly payment for the reaffirmed debt. Adding another $216 each month when there is no income will create an "undue hardship." Obviously, the Court's contemplation does not allow Debtor to remain unemployed, but neither is it likely he will continue to avoid certain expenses by living with his parents. Considering the wages available to a high school graduate with a steady employment history of painting and some sales experience, this twenty-year repayment schedule will make it difficult to manage a "minimal" standard of living, even if Debtor remains single with no dependents.

● Debtor's parents are in their 60s and live on a fixed income. They own no real property and have little personal property. Eunice Law is in poor health now. As both of them grow older, health concerns will undoubtedly increase, and, along with that, medical expenses, despite the fact they are covered by health insurance. Their income and expenses are manageable now, but to add another $216 each month until they are both well into their 80s would unquestionably create an "undue hardship."

## CONCLUSION

Once Debtor opted to change careers and made a personal and financial commitment to obtain a commercial pilot's license, circumstances beyond his control created a condition of insolvency. Debtor did not voluntarily leave flight training school—it left him—literally. And the good faith effort to repay this student loan was not abandoned; rather, payments were made even after the school's financial problems affected the quality of training being delivered. The school closed before Debtor received any financial benefit from the bargained-for education. Debtor was left without any marketable skills. To require a $20,000 student loan be repaid over twenty years in exchange for having received the equivalent of two-and-a-half weeks of useless training would, in this Court's opinion, create an "undue hardship" for both Debtor and his co-signing parents. The unique and extraordinary circumstances relative to the education being sought, when considered in view of the abuse intended to be remedied by Section 523(a)(8) and in view of the fresh start policy of bankruptcy discharge, heavily influence the Court to strike an equitable balance in favor of finding "undue hardship." The Court will enter an appropriate order.

## ORDER DETERMINING DISCHARGE-ABILITY UNDER 11 U.S.C. § 523(a)(8)(B)

Pursuant to the Court's decision entered this date regarding two consolidated adversary complaints seeking to determine the dischargeability of a student loan debt under the "undue hardship" provision of 11 U.S.C. § 523(a)(8)(B), and the Court having determined that based on the unique facts and circumstances of this case as balanced by the fresh start policy of bankruptcy and the abuse intended to be remedied by 11 U.S.C. § 523(a)(8), it is hereby

ORDERED that judgment be granted in favor of these Plaintiffs inasmuch as this case does not represent the kind of abuse intended to be remedied by 11 U.S.C. § 523(a)(8) and that an "undue hardship" will result if repayment is required.